473 F.Supp. 393 (1979)
In re URANIUM ANTITRUST LITIGATION.
WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,
v.
RIO ALGOM LIMITED, Rio Algom Corporation, Rio Tinto Zinc Corporation Limited, RTZ Services Limited, Rio Tinto Zinc Corporation, Conzinc Rio Tinto of Australia Limited, Mary Kathleen Uranium Limited, Pancontinental Mining Limited, Queensland Mines Limited, Nuclear Fuels Corporation, Anglo-American Corporation of South Africa, Limited, Engelhard Minerals and Chemicals Corporation, Denison Mines, Limited, Denison Mines (U.S.) Incorporated, Noranda Mines Limited, Gulf Oil Corporation, Gulf Minerals Canada Limited, Kerr-McGee Corporation, the Anaconda Company, Getty Oil Company, Utah International Inc., Phelps Dodge Corporation, Western Nuclear, Inc., Homestake Mining Company, Atlas Corporation, Reserve Oil and Minerals Corporation, United Nuclear Corporation, Federal Resources Corporation, and Pioneer Nuclear, Inc., Defendants.
MDL 342, No. 76 C 3830.
United States District Court, N. D. Illinois, E. D.
April 30, 1979.
*394 *395 Roger Pascal, Schiff, Hardin & Waite, Chicago, Ill., for the Anaconda Co.
*396 Gregory A. Adamski, Winston & Strawn, Chicago, Ill., Michael V. Corrigan, Simpson, Thacher & Bartlett, New York City, for Atlas Corporation.
Richard L. Blatt, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Laurence V. Senn, Jr., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Canada and Denison U. S.
Kenneth R. Gaines, Altheimer & Gray, Chicago, Ill., Raymond L. Falls, Jr., Cahill, Gordon & Reindel, New York City, for Englehard Minerals.
Richard K. Decker, Lord, Bissel & Brook, Chicago, Ill., Leonard J. Lewis, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for Federal Resources Corp.
James W. Hathaway, Burditt & Calkins, Chicago, Ill., Brenton F. Goodrich, Overton, Lyman & Prince, Los Angeles, Cal., for Getty Oil Co.
Jonathan G. Bunge, Keck, Cushman, Mahin & Cate, Chicago, Ill., Richard T. Colman, Howrey & Simon, Washington, D. C., for Gulf Oil Corporation and Gulf Minerals Canada, Ltd.
J. Craig Busey, McDermott, Will & Emery, Chicago, Ill., David M. Balabania, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Homestake Mining Co.
Thomas W. Johnston, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee Corp.
Joseph S. Wright, Jr., Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda Mines Ltd.
John H. Hall, Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps Dodge Corp. and Western Nuclear, Inc.
Thomas D. Allen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Andrew Barr, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for Pioneer Nuclear, Inc.
Richard P. Campbell, McConnell & Campbell, Chicago, Ill., for Reserve Oil & Minerals Corp.
Paul G. Gebhard, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Richard E. Sherwood, O'Melveny & Myers, Los Angeles, Cal., for RTZ Corp. of America.
Robert T. Johnson, Jr., Bell, Boyd, Lloyd, Raddad & Burns, Chicago, Ill., W. Perry Pearce, Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., for United Nuclear Corp.
Watson B. Tucker, Mayer, Brown & Platt, Chicago, Ill., for Utah International, Inc.
Keith F. Bode, Jenner & Block, Chicago, Ill., for Rio Algom Corporation.
Lee A. Freeman, Jr., Freeman, Rothe, Freeman & Saltzman, Chicago, Ill., Raymond F. Scannell, Asst. Gen. Counsel, Westinghouse Electric Corporation, Pittsburgh, Pa., George S. Leisure, Jr., Donovan, Leisure, Newton & Irvine, New York City, for Westinghouse.

MEMORANDUM DECISION
MARSHALL, District Judge.
Plaintiff Westinghouse Electric Corporation has moved to dismiss various counterclaims filed by seven defendants  Atlas Corporation, Anaconda Company, Kerr-McGee Corporation, Homestake Mining Company, Western Nuclear, Inc., Getty Oil Company, and Utah International, Inc. Westinghouse's motions fall into three categories. First, it challenges the standing of five counterclaimantsAtlas, Anaconda, Kerr-McGee, Getty and Homestake  to allege that Westinghouse has violated Section 2 of the Sherman Act by unlawfully monopolizing, attempting to monopolize or conspiring to monopolize markets for nuclear steam supply systems ("NSSS" or "reactors") and nuclear fuel assemblies ("fabricated fuel") for those systems. Second, it attacks the standing of all seven counterclaimants to allege that Westinghouse has violated Section 1 of the Sherman Act and Section 3 of the Clayton Act by unlawfully offering predatorily low-priced uranium as a tying product to induce electric utilities to purchase Westinghouse's fabricated fuel and reactors  the tied products. Both of these motions are based on the theory that the counterclaimants have suffered no legally *397 cognizable injury since they neither buy fabricated fuel or reactors, nor compete with Westinghouse in those markets. Third, Westinghouse has moved to dismiss Utah's counterclaim under Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), which alleges that Westinghouse deceived its utility customers by falsely representing "that it had the capability to carry through its commitments to make future deliveries of uranium to the utilities." Westinghouse contends that this claim is beyond the scope of § 43(a), which only prohibits trademark misuse or similar misconduct. This argument raises a question of statutory construction, and can be evaluated independently of the other motions. To analyze the standing arguments surrounding the tying and monopolization claims, we must make a detailed inquiry into the alleged market position of each of the parties, and then apply the tests of antitrust standing to the peculiar factual matrix which is presented.
All the antitrust counterclaimants complain that Westinghouse utilized various anticompetitive practices, including predatory pricing, short-selling, fraudulent representations, tying arrangements and forced combination sales, to restrain trade and monopolize or attempt to monopolize commerce in markets for uranium, fabricated fuel and reactors.[1] Each of these products is sold at a different level of the nuclear power industry. Counterclaimants generally operate only on the uranium level, by producing and then selling uranium to electric utility customers and others. Westinghouse operates on all three levels, selling uranium, fabricated fuel and reactors to the same consumers. Westinghouse's motions essentially seek to confine counterclaimants' antitrust challenges to the uranium market. Because its motions are premised on a perceived economic separation between those markets, we must describe the relationships between uranium, fabricated fuel and reactors in the nuclear power industry.[2]
Nuclear power plants are used by electric utility companies to generate electricity. The energy source for these plants is uranium. Uranium must be processed in several ways before it is suitable for use as nuclear fuel. It begins as mined uranium ore, which is milled to extract uranium concentrates (U3O8), which are known in the industry as "yellowcake." Yellowcake is then converted to uranium hexafluoride (UF6). Uranium hexafluoride is then enriched through a gaseous diffusion process to increase the concentration of the fissionable U-235 isotope. The enriched UF6 is then chemically converted into uranium dioxide powder (UO2). After the powder is compressed and shaped into pellets, it is ready for use in a nuclear reactor.
In this country, different entities perform these steps in the fuel process. All counterclaimants have active mining and milling operations, and sell yellowcake to electric utilities (Atlas ¶ 25, Anaconda ¶ 121, Getty ¶ 130, Homestake ¶ 7, Kerr-McGee ¶ 4, Utah ¶ 2, Western Nuclear ¶ 127). Conversion of yellowcake to uranium hexafluoride is performed by Allied Chemical Company, a nonparty, and by Kerr-McGee. (Kerr-McGee ¶ 10(b)). All three domestic enrichment plants are owned by the federal government, which provides enrichment services to private parties on a contractual basis. None of the counterclaimants allege that they presently convert enriched UF6 into UO2 powder or pellets. But Kerr-McGee did offer these services between 1965 and 1975. (Kerr-McGee ¶ 4).
After it has reached the pellet form, the uranium is ready to enter the fuel fabrication process. The pellets are placed inside zirconium alloy or stainless steel tubes. Many thousands of these fuel rods are then arranged in clusters to form a fuel assembly. The number and arrangement of fuel *398 rods are individually engineered for each reactor design. From 1966 through 1975, in addition to reactor manufacturers, several non-reactor companies produced fuel assemblies, including Kerr-McGee, Nuclear Fuel Service Corporation, United Nuclear Corporation, Exxon Nuclear Company, Inc., and Nuclear Materials and Equipment Corporation. At the present time, however, Exxon (a non-party) is the only remaining independent fabricator which competes with Westinghouse and the other reactor manufacturers for fuel fabrication business (Kerr-McGee ¶ 13, Utah ¶ 7). Besides Kerr-McGee, none of the other counterclaimants claim any past or present stake in the fuel fabrication market.
After fabrication into fuel assemblies, the uranium is ready to be housed in the power-generating equipment of the nuclear power plant, which is known as the Nuclear Steam Supply System (NSSS). The NSSS consists principally of a reactor enclosed within a steel pressure vessel, as well as other standard electrical generating equipment. The fuel assembly is placed into the reactor and surrounded by water. The heat created by the nuclear fission reaction creates steam, which causes turbines to rotate, which in turn generate electricity. The United States market for nuclear reactors is supplied by five manufacturers. Westinghouse is the largest manufacturer with about 39% of the market; General Electric is next with about 31%; Combustion Engineering Inc. and Babcock & Wilcox Co. have about 15% and 12%, respectively, and General Atomic, Inc. has an insignificant share based on sporadic sales in two or three years over the last decade. (Kerr-McGee ¶ 9, Western Nuclear ¶ 137). None of the counterclaimants manufacture or sell nuclear reactors.
The first fuel assemblies used in a reactor are usually fabricated and sold to the utility customer by the reactor manufacturer at the time the reactor is purchased. (Kerr-McGee ¶ 11). After a reactor operates for twelve to eighteen months, some of the fissionable uranium becomes depleted. Consequently, some of the original fuel assemblies must be replaced and others rearranged. Thereafter, one third of the fuel core must be replaced annually. The replacement fuel assemblies are called reloads. Reload fabrication is performed by a reactor manufacturer or an independent fuel fabricator. (Kerr-McGee ¶ 12, Western Nuclear ¶ 130).
A variety of contractual methods have been used by utilities and fuel fabricators to allocate responsibility for procuring fuel for initial fuel cores and reloads. In some cases, the fuel fabricator is responsible for obtaining the yellowcake and for obtaining services for the conversion and enrichment of the yellowcake. In other cases, obtaining one or both of these services is the responsibility of the utility. In still other instances, the yellowcake is obtained by the utility, but one or both of the services is the responsibility of the fuel fabricator. (Kerr-McGee ¶ 14). Counterclaimants all allege that they sell yellowcake, but some are silent on whether they sell or offer to sell yellowcake to utilities, fuel fabricators, or both. (Atlas ¶ 125, Homestake ¶ 7, Kerr-McGee ¶ 4, Western Nuclear ¶ 127). Others allege that they have sold uranium to reactor manufacturers and to electric utilities (Anaconda ¶ 121), to electric utilities and "others" (Getty ¶ 130), or to electric utilities and "intermediaries" (Utah ¶ 2). All allege that the effect of Westinghouse's alleged antitrust violations has been to deprive them of potential uranium sales to electric utilities.
Counterclaimants allege that Westinghouse participates vigorously in all three markets  uranium, fuel fabrication and reactor manufacture. Westinghouse is the largest single reactor manufacturer in the United States. It has sold more than one hundred reactors in the United States, giving it a 38-40% market share. In 1971 its reactors accounted for about 40% of the generating capacity of commercial nuclear power plants supplied by U.S. manufacturers. (Anaconda ¶ 123, Homestake ¶ 9, Western Nuclear ¶ 136). Westinghouse is presently one of a very few commercial fabricators of fuel assemblies in this country. Its estimated market share in the *399 United States for fuel assemblies sold to date is between 35% and 40%. (Homestake ¶ 9, Atlas ¶¶ 43, 27, Utah ¶ 7, Kerr-McGee ¶ 13). Since the mid-1960's Westinghouse has sold large quantities of yellowcake to electric utility customers for long-term delivery at various times up through the end of this century. By 1975, Westinghouse had agreed to deliver some eighty million pounds of yellowcake to utilities during this period. (Anaconda ¶ 125(f), Kerr-McGee ¶ 23, Utah ¶ 11, Western Nuclear ¶ 139). At the beginning of 1976, Westinghouse's commitments represented about 20% of commercial uranium commitments by all producers to all buyers for contracts through 1994. (Kerr-McGee ¶ 23, Western Nuclear ¶ 141). Estimates of Westinghouse's present orders for yellowcake range as high as one hundred fifteen million pounds. (Atlas ¶ 127, Homestake ¶ 9). Although Westinghouse has a wholly-owned subsidiary engaged in uranium exploration and mining, and has subscribed to several joint ventures engaged in uranium exploration and mining (Atlas ¶ 28, Homestake ¶ 10, Utah ¶ 4), some counterclaimants seem to allege that Westinghouse has no ability to meet any of its contractual obligations from its own production, and will have to rely entirely on purchases of yellowcake from other sources. (Kerr-McGee ¶ 23, Anaconda ¶ 125(a)). All counterclaimants agree that Westinghouse has no uranium available in its inventory to meet the large majority of its uranium commitments. (See, e. g. Western Nuclear ¶¶ 140-41). Thus, Westinghouse's alleged position as a major yellowcake supplier is not buttressed by a concomitant position as a major yellowcake producer. Westinghouse's productive capacity and dominance instead lies in its reactor and fabricated fuel operations.
With this industry background in mind, we proceed to outline the challenged actions of defendants' counterclaims. Westinghouse attacks counterclaimants' standing to press two claims: 1) that Westinghouse monopolized or attempted to monopolize the fabricated fuel or reactor markets and 2) that Westinghouse used uranium as a tying product to coerce electric utilities to purchase fabricated fuel or reactors from Westinghouse. Westinghouse does not contend that counterclaimants lack standing to pursue their other claims: 1) that Westinghouse monopolized or attempted to monopolize the uranium market or 2) that Westinghouse used reactors or fabricated fuel as a tying product to coerce utilities to purchase tied uranium from it; or 3) that Westinghouse bundled together its sales of uranium, fabricated fuel and reactors, requiring utilities to purchase these products in a package, with the result that competitors in all three markets were injured. (Westinghouse Response, filed 1/17/79, at 5).

I. Tying Counterclaims
We will first describe the challenged tying claim. Although each counterclaim has individual variations in language and form, the essential content of the allegations is the same. Westinghouse allegedly offered to sell yellowcake to its electric utility customers, at prices below the prevailing market, on the condition that the utilities also buy Westinghouse's reactors, fabricated fuel, or both. (Atlas ¶ 37, Anaconda ¶ 125(b), Getty ¶ 133(b), Homestake ¶ 18, Kerr-McGee ¶¶ 18-20, Utah ¶ 12, Western Nuclear ¶ 138). Low-cost yellowcake was thus used as a tying product to coerce utilities to buy tied reactors or fabricated fuel. At least one counterclaimant alleges that Westinghouse was able to maintain its tie-ins by cross-subsidization, that is, by using its profits from its sale of reactors and fabricated fuel to underwrite its predatorily low-priced uranium.[3] (Kerr-McGee ¶ 18).
As a result of its tie-ins, and of other allegedly illegal conduct, such as exclusive dealing contracts, predatory pricing, shortselling and fraudulent misrepresentations, Westinghouse acquired contracts to sell utilities over eighty million pounds of uranium, which was about 20% of the market. *400 In making these contracts, Westinghouse agreed to provide uranium it did not have and to provide it at unreasonably low prices. Westinghouse also fraudulently misrepresented that it was able to supply the agreed quantities of yellowcake. It then failed to cover its contractual obligations, leaving it short some sixty-five million pounds of uranium. (Kerr-McGee ¶¶ 23-26, Western Nuclear ¶¶ 139-140).
Westinghouse's conduct had the effect of creating a serious supply-demand imbalance in the yellowcake market. Westinghouse's sales of large amounts of yellowcake, which were at least partially induced by its use of uranium as a tying product, led many utilities which had contracted with Westinghouse to refrain from purchasing from other uranium suppliers, including counterclaimants. This lowered demand for counterclaimants' yellowcake and caused them to accept depressed prices for contracts they were able to make. This demand-price reduction was an artificial one, however, because Westinghouse did not possess the large quantities of yellowcake due for supply under the contracts. The "phantom" uranium was in reality held by other producers, or was in as-yet undeveloped mines or properties. This fact was fraudulently concealed by Westinghouse. Believing that no strong market for their uranium existed, counterclaimants had no incentive to make capital investments to develop new or existing uranium sources. When the illusory nature of Westinghouse's supplies was exposed, counterclaimants were suddenly confronted with demands for the shortfall. However, the depressed prices and reduced capital investment of the preceding years left them unprepared to capitalize on these new sales opportunities, resulting in the loss of substantial revenue and profits. Counterclaimants conclude that Westinghouse's tying arrangement resulted in a lessening of competition in the markets for uranium, fabricated fuel and reactors, and, more specifically, in injury to their position as producers and sellers of uranium. (See Atlas ¶ 41; Anaconda ¶¶ 126-127; Getty ¶ 134; Homestake ¶¶ 18, 29; Kerr-McGee ¶¶ 20, 26-28; Utah ¶¶ 18-19, Western Nuclear ¶¶ 140-143).
Westinghouse's motion to dismiss these counterclaims is based on the proffered theory that, to have standing to attack an alleged tie-in, a private antitrust plaintiff must be either a purchaser of the tied product (reactors and fabricated fuel) or a competitor of the defendant in the market for the tied product. None of the counterclaimants alleges that it satisfies this test. The purchasers are the utility companies, and the affected competitors are the reactor and fabricated fuel manufacturers.[4] Instead, counterclaimants all allege that they compete with Westinghouse in the market for uranium, the tying product, and that their businesses are injured in that market. Westinghouse contends that the alleged impact on counterclaimants' business in that market is too remote, speculative and indirect to support a private antitrust claim.
In response, counterclaimants argue that the case law does not support a denial of standing to a fixed category of antitrust plaintiffs, without additional consideration of the directness of their injury. They contend that even competitors in the tying product market may sue if they were directly and foreseeably injured by the tie-in device. By their analysis, counterclaimants suffered such an injury here, because Westinghouse's "tying uranium obtained its tying power from its unreasonably low price," and that price was made possible solely by Westinghouse's cross-subsidization of its uranium losses by its profits in the reactor and fabricated fuel markets. The greater the success of the tie-in, the more uranium sales which were diverted from counterclaimants. Furthermore, the injury was foreseeable because counterclaimants are Westinghouse's direct competitors in the sale of uranium to utilities which use Westinghouse's reactors and fabricated fuel. They are not remote links in the chain of distribution, nor are they only indirectly or *401 derivatively affected by competitive injury to others.
We find some merit in the arguments by both Westinghouse and counterclaimants, and think that their contrary conclusions are the product of the doctrinal confusion which has characterized the law of antitrust standing. The confusion arises from the failure to distinguish between the scope of antitrust standing and the scope of protection under the antitrust laws. See Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 835 (1977). The scope of antitrust protection extends to those persons who are either directly or indirectly injured by antitrust violations, and whose injury is "of the kind the antitrust laws were written to guard against." Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163, 1168 (7th Cir. 1978). The standing doctrine narrows this class of injured persons to a subclass of plaintiffs who are best situated, because of their market position, to serve the twin goals of providing compensation for injuries and preserving a competitive market structure. Applying this analysis, we conclude that counterclaimants are not protected by the doctrine of per se illegality which normally attaches to the antitrust prohibition against tying arrangements, but nevertheless are within the scope of protection and standing to challenge those practices under a rule of reason analysis.[5]
A tying arrangement is the sale of one item (the tying product) only on condition that the buyer take a second item (the tied product) from the same source. Such arrangements are per se unreasonable, and therefore violative of the antitrust laws, if 1) the tie-in involves two distinct products, 2) the defendant has sufficient economic power in the tying market to impose significant restraints in the tied product market and 3) a "not insubstantial" amount of commerce in the tied product market is affected. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 499, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (Fortner I), quoting Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Once those elements are demonstrated, plaintiff need not specifically show that defendants' practices produced an unreasonably anticompetitive effect.
The doctrine of per se illegality is only applied to those agreements or practices which have a pernicious effect on competition and lack any redeeming virtue. Northern Pacific Ry. Co., supra, 356 U.S. at 5, 78 S.Ct. 514. In placing tie-ins in this category, the Supreme Court has focussed exclusively on the anticompetitive impact of tie-ins on the market for the tied, not the tying, product. In Times Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953), the Court stated that
The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant `tying' product, resulting in economic harm to competition in the `tied' market.
In United States v. Loew's Inc., 371 U.S. 38, 44-45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962), the Court said tying arrangements
. . . are an object of anti-trust concern for two reasons  they may force buyers into giving up the purchase of substitutes for the tied product, . . . and they may destroy the free access of *402 competing suppliers of the tied product to the consuming market . . ..
Justice Black reiterated in Northern Pacific Ry. Co. that:
Where such [tie-in] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. . . . [Tying arrangements] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products.
356 U.S. at 6, 78 S.Ct. at 518 (emphasis added). Justice White, in his dissenting opinion in Fortner I, adopts the same perspective:
There is general agreement in the cases and among commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second [tied] product.

394 U.S. at 512, 89 S.Ct. at 1263 (emphasis added). The Courts of Appeals echo these sentiments with statements that "[t]he evil of a tying agreement is the restraint of competition in the tied product." Holleb & Co. v. Produce Terminal Cold Storage Co., 532 F.2d 29, 32 (7th Cir. 1976); Southern Concrete Co. v. United States Steel Corp., 535 F.2d 313, 316-17 (5th Cir. 1976).
These cases clearly indicate that the judicial doctrine of per se unreasonableness in tying arrangements was only designed to protect competitors and purchasers in the market for the tied product, where the major anticompetitive effects are felt. An extension of that doctrine to protect competitors in the tying market would be justified only if tying arrangements "inevitably curbed" competition in that market as well. We know too little about the actual impact of the challenged tie-in to justify such an extension at this stage. And we are skeptical that evidence could be introduced to support that step here. Professors Areeda and Turner have noted in their recent treatise that, "with some exceptions, tying arrangements do not reinforce the firm's market power in the tying product. . . . Ordinarily, the adverse effects, if any, are on competition in the tied item." P. Areeda and D. Turner, Antitrust Law ¶ 733 at p. 258 (1978).
The allegations in the counterclaims do not convince us that Westinghouse's practices would have such an inherently pernicious effect on competition in the tying market so as to warrant a conclusive presumption of illegality. First, Westinghouse's alleged market power in uranium was illusory. Westinghouse sold large quantities of uranium, but lacked the productive capacity to supply it. It masked its short-selling scheme by falsely misrepresenting its ability to cover. Second, Westinghouse's alleged degree of control in the tied product markets (reactors and fabricated fuel) is not great enough to conclusively infer that it possessed sufficient leverage to extend its economic power to the tying product market (uranium). In some situations, where the major or exclusive use of the tying product is in connection with the tied product, and the defendant possesses overwhelming power in one of those markets, control of one can lead to control of the other. See Areeda & Turner, supra, ¶ 733 at pp. 259-60; United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 325 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). Some courts have defined tying arrangements in such broad terms, theoretically expanding their per se prohibition to cover all extensions of economic power from one market to another. See, e. g., Spartan Grain & Mill Co. v. Ayers, 581 F.2d 419, 425 (5th Cir. 1978). Here Westinghouse's alleged 40% share of the reactor and fabricated fuel markets is insufficient to draw a conclusive presumption of illegal leveraging.
Although counterclaimants' alleged injury is not of the kind the doctrine *403 of per se unreasonableness was intended to guard against, it is within the scope of protection afforded by the antitrust laws against arrangements which unreasonably restrain trade (§ 1 of the Sherman Act) or which substantially lessen competition or tend to create a monopoly (§ 3 of the Clayton Act). The allegations of the counterclaims invoke these more general standards of the antitrust laws. We also hold that counterclaimants' alleged injury is sufficient to give them standing to sue. They allege that Westinghouse's tie-in practice reduced demand and lowered prices for uranium, causing them to lose sales and profits to Westinghouse and to delay capital investment needed to meet the actual demand. The sales diversion and investment inhibition were caused by Westinghouse's predatorily-low pricing of the tying product, which in turn was made possible by Westinghouse's cross-subsidization of those low prices by profits earned through its domination or monopolization of the tied products. Westinghouse's alleged predation and tie-in weakened competition in the uranium market by artificially limiting the opportunities of rivals and new entrants. Because counterclaimants sold uranium in direct competition with Westinghouse, their injury does not have the indirect quality which is characteristic of chain-of-distribution cases. See, e. g., Illinois Brick Co. v. Illinois, supra. The injury is immediate and severe. This case also does not raise any risk of duplicative recoveries, since counterclaimants only seek recovery for damages incurred in the uranium market, not for those suffered by Westinghouse's competitors or customers in the reactor and fabricated fuel markets. Counterclaimants fit within the class of ". . . those who have been injured by [alleged] restraints imposed by defendant on competitive forces in the economy." Lupia, supra, 586 F.2d at 1168. We conclude that counterclaimants have standing under the general standards of Section 1 of the Sherman Act and Section 3 of the Clayton Act to challenge Westinghouse's alleged use of uranium as a tying product to coerce utilities and others to purchase its reactors and fabricated fuel. They are entitled to an opportunity to prove an antitrust violation "on the basis of a more thorough examination of the purposes and effects of the practices involved . . ." Fortner I, supra, 394 U.S. at 500, 89 S.Ct. at 1257. Westinghouse's motion to dismiss these counterclaims is denied.

II. Section 2 Counterclaims
Five defendants  Atlas, Anaconda, Getty, Homestake, and Kerr-McGee  have accused Westinghouse of Section 2 violations in the markets for reactors, fabricated fuel and uranium. The supporting factual allegations are the same as or very similar to those underlying the tying claims.
Westinghouse offered and made package deals with electric utilities to provide them with nuclear reactors, fabricated fuel, and uranium. The actual mechanics behind those deals are variously described in the counterclaims. Westinghouse required utilities to buy all three products together for a total combination price, without regard to the true value of each of the component products. Or Westinghouse sold uranium to utilities at unreasonably low prices, on condition that they also buy Westinghouse's reactor and fabricated fuel. Or Westinghouse used its low-priced uranium as a "loss leader" to induce utilities to buy reactors and fabricated fuel from Westinghouse. Westinghouse's ability to make these deals stemmed from its dominance in the reactor and fabricated fuel markets, and its ability to subsidize its uranium losses with profits on sales in those markets.
In offering these package deals, Westinghouse falsely misrepresented that it could supply all of its purchasers' uranium requirements and could service their full nuclear needs, when in fact Westinghouse had neither the ability nor the intent to cover its sales. By its conduct, Westinghouse successfully induced utilities to enter into longterm exclusive dealing contracts covering all or almost all their uranium requirements. Westinghouse's short-selling program was intended to artificially manipulate the yellowcake market. Westinghouse first seized a sizeable percentage of longterm *404 uranium demand by offering very low prices, then delayed its arrangements with uranium producers to cover its sales, apparently hoping the depressed market would produce a price low enough to protect its short position. As we noted earlier with the tying allegations, Westinghouse's conduct had the effect of diverting uranium sales from counterclaimants to Westinghouse, of diminishing market demand and prices for uranium, of curtailing the forward supply of uranium and of discouraging capital investment and market expansion by competing uranium producers. (Atlas ¶¶ 44-45, Anaconda ¶¶ 125-127, Getty ¶¶ 133-137, Homestake ¶¶ 25-26, Kerr-McGee ¶¶ 18-28).
Counterclaimants allege that Westinghouse has used its market power in uranium, reactors and fabricated fuel in an anticompetitive and monopolistic manner in violation of Section 2 of the Sherman Act. However, the various counterclaimants diverge in enumerating the specific Section 2 offenses. Atlas and Homestake claim that Westinghouse has monopolized, attempted to monopolize, and conspired to monopolize the reactor and fabricated fuel markets, but has only attempted and conspired to monopolize the yellowcake market. (Atlas ¶¶ 46-47, Homestake ¶¶ 27-28). Getty and Anaconda claim that Westinghouse has monopolized and attempted to monopolize all three markets. (Getty ¶ 138, Anaconda ¶ 124). In addition, Western Nuclear states that it intends to amend its counterclaim to come within this category, although its present allegations only charge monopolization and attempted monopolization of the uranium market. (Western Nuclear ¶ 150). Kerr-McGee claims that Westinghouse has monopolized, attempted to monopolize, and conspired to monopolize all three markets, as well as various submarkets. (Kerr-McGee ¶ 38).
Westinghouse has moved to dismiss the five counterclaims "to the extent that counterclaimants seek damages or injunctive relief for injury to their business or property or threatened loss or damage resulting from Westinghouse's alleged monopolization, attempted monopolization, or conspiracy to monopolize the markets for reactors or fabricated nuclear fuel." (Westinghouse Supp. Memo p. 14). Westinghouse theorizes that counterclaimants lack standing to complain of monopolization in reactors and fabricated fuel because they are neither consumers nor competitors in those markets. Instead, they are "mere suppliers" of uranium to those market participants. Westinghouse views this connection as too attenuated to confer standing.
In response, counterclaimants argue that they are more than "mere suppliers" to the two markets, and that certain suppliers can have standing to assert claims for injuries caused by actual or attempted monopolization of a market in which they do not directly compete. They recognize that suppliers may lack standing if their injury is only a ripple effect from an antitrust violation in a distant market. But counterclaimants view their injury as more than the loss of sales of uranium to participants in the reactor and fabricated fuel markets because of Westinghouse's monopolistic restraints on the businesses of those participants. Their injury on the uranium level of the industry is not merely the fallout from Westinghouse's violations on the fabricated fuel and reactor levels, but instead is part of the bomb crater caused by a unified attack on all three markets. They contend that Westinghouse is a vertically integrated company which has monopolized or attempted to monopolize multiple levels of the nuclear power industry by bundling together sales of reactors, fabricated fuel and uranium. Westinghouse excluded, or attempted to exclude, competition from all three markets as part of a single comprehensive scheme. They conclude that "whether its true purpose was to monopolize uranium for its own sake, or to leverage its market power there to exclude competitors in fabrication and reactors, Westinghouse took aim at the counterclaimants and should not be shielded from liability because the end of its scheme was monopolization of a `downstream' market." (Counterclaimants' Memo, p. 4).
*405 In reply, Westinghouse emphasizes that it does not seek to immunize itself from antitrust liability, since it has not challenged counterclaimants' standing to recover damages for alleged Section 2 violations in the uranium market. Counterclaimants compete with Westinghouse for the sale of that product, and are clearly injured by Westinghouse's alleged attempts to cover that market. Westinghouse's motions instead "seek to prevent counterclaimants from asserting that Westinghouse violated the antitrust laws in markets in which they have never been engaged  reactors and fabricated fuel." (Westinghouse Reply Memo, p. 4). Westinghouse views the monopolization claims as separable and distinct, and rejects counterclaimants' arguments that Westinghouse's alleged cross subsidization of profits and leveraging of power from its reactor and fabricated fuel markets can tie all three together. Westinghouse urges that if it used the fruits of its monopoly power to engage in predatory pricing or tying arrangements in the uranium market, counterclaimants' proper remedy is a claim for antitrust violations in that market alone.
We think counterclaimants have the better arguments. They have accused Westinghouse with monopolization or attempted monopolization of multiple levels of the nuclear power industry through the exercise of large amounts of market power. Two lines of antitrust violations are involved. One line is created by counterclaimants' allegations that Westinghouse has vertically integrated all three nuclear markets, thereby causing an overall constriction of uranium buyers and a resulting monopsonistic injury to uranium suppliers. For example, Atlas claims that Westinghouse used low-priced yellowcake
. . . to entice utilities to buy their full nuclear power needs, including nuclear reactors, fabricated fuel assemblies, and yellowcake, from Westinghouse, for the purpose and with the effect of entrenching Westinghouse's dominant position in the nuclear reactor and fabricated fuel assembly markets, and enhancing its position in the yellowcake market. (¶ 37).
As part of its package deal to provide for the utilities' fuel nuclear needs, Westinghouse offered
. . . to act as agent for electric utility company customers in their purchases of yellowcake, with the intent to control such purchases only from or through Westinghouse, to the exclusion of competing yellowcake purchasers. (¶ 45(f)).
Another line of antitrust violations, economically perpendicular to the first, is created by counterclaimants' allegations that Westinghouse has horizontally monopolized or attempted to monopolize the three nuclear markets, thereby simultaneously harming its competitors in the primary markets and also increasing its leverage through package sales in upstream or downstream markets, causing injury to competitors in those secondary markets. Thus, for example, Atlas alleges that Westinghouse has used package deals as a vehicle for achieving dominance in the three markets, and has also been able to use package deals successfully as a consequence of its dominance in those same markets, with market power thus serving as both a means and an effect. (¶¶ 44(a), 45(a)). The counterclaims therefore describe a situation where the same acts of Westinghouse (i. e., its combination sales) have caused two geometrically related lines of antitrust violations.
Westinghouse tries to dissect those two lines, viewing the counterclaims as a complex of several separable antitrust violations. However, we agree with counterclaimants that their pleadings describe a single massive antitrust violation throughout an industry, causing a synergistic continuum of injury to market participants. At this stage of the pleadings, we see no way to segregate issues of proof and injury by market level. Counterclaimants are entitled to recover for their injuries which flow from Westinghouse's anticompetitive conduct in all three levels of the industry.
We will not make a detailed attempt to harmonize our decision with the myriad factual situations appearing in other antitrust standing decisions. We have found few, if any, which contain a similar configuration *406 of parties with comparable antitrust theories of recovery. And we see little need to decide whether to adopt a "competitor-only" or a "direct and foreseeable" standing test to measure the alleged injury, since such stock phrases add nothing to the analysis of the antitrust policies involved. Courts have recognized "the overriding importance of the facts of each case as opposed to the particular test employed," Cromar v. Nuclear Materials & Equipment Corp., 543 F.2d 501, 508 n. 13 (3d Cir. 1976), so we have concentrated our efforts in that area. We do point to two groups of cases which support our analysis. The first holds that Section 2 prohibits the use of monopoly power by a vertically integrated company on one level of an industry to destroy competition on another level. Poster Exchange, Inc. v. National Screen Service Corp., 431 F.2d 334, 339 (5th Cir. 1970); FLM Collision Parts, Inc. v. Ford Motor Company, 406 F.Supp. 224, 245-46 (S.D.N. Y.1975), aff'd in relevant part, 543 F.2d 1019, 1030 (2d Cir. 1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); Southern Concrete Co. v. United States Steel Corp., 394 F.Supp. 362, 379-80 (N.D.Ga.1975), aff'd, 535 F.2d 313 (5th Cir. 1976); United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 346 (D.Mass. 1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). The second grants standing to suppliers who are not in a direct contractual or competitive relationship with persons in the market which defendant attempted to monopolize. Cromar, supra; South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966); see also, Berger & Bernstein, supra, 86 Yale L.J. at 866-70; L. Sullivan, Handbook of the Law of Antitrust 773 (1977).[6]
Westinghouse's motions to dismiss the Section 2 counterclaims are denied.

III. Lanham Act Counterclaim
Westinghouse's final motion seeks to dismiss Count III of Utah's counterclaim, which is based on Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a). In that count, Utah first repeats ten paragraphs from Count I, which is based on Section 1 of the Sherman Act. Nine of those allegations describe the parties and the structure of the nuclear power industry. The tenth alleges that Westinghouse has contracted with numerous utilities to provide them with nuclear power plants, fabricated fuel, and eighty million pounds of uranium on a long term basis. Utah then adds the allegations in Count III that Westinghouse made two false representations to its utility customers when it negotiated and formed those contracts. First, Westinghouse said "that it had the capability to carry through its commitments to make future deliveries of uranium to the utilities, when it knew or should have known that it had no such capability." Second, Westinghouse said "that it either owned sufficient uranium (or rights thereto) or would be able to obtain sufficient uranium to enable it to meet its commitments to make future deliveries of 80 million or more pounds to the utilities, when it owned only 15 million pounds of uranium (or rights thereto) and had no such ability." Utah claims that these misrepresentations damaged its business and profit position by diverting uranium sales from Utah to Westinghouse and by artificially depressing uranium prices.
In its motion to dismiss, Westinghouse argues that these allegations fall outside the scope of Section 43(a), which only prohibits misuse of a trademark or practices of a similar nature. Westinghouse relies chiefly on Bernard Food Industries, Inc. v. Dietone Co., 415 F.2d 1279 (7th Cir. 1969). In that case, the Seventh Circuit quoted at length the "correct interpretation" of the Lanham Act contained in Samson Crane Co. v. Union National Sales, Inc., 87 F.Supp. *407 218 (D.Mass.1949), aff'd per curiam, 180 F.2d 896 (1st Cir. 1950), including a statement that Section 43(a) embraces "only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trademarks." According to Westinghouse's definition, this limiting phrase covers misrepresentations which create consumer confusion over the source or content of defendant's products, or which somehow enable defendant to capitalize on plaintiff's reputation. Westinghouse concludes that its alleged misrepresentations are not of this character, since they only involve Westinghouse's ability to supply its goods to its utility customers.
Utah concedes that it has not accused Westinghouse of trademark misuse or of making misrepresentations concerning the source, qualities or ingredients of its goods. But it argues that Section 43(a) has a much broader scope than Westinghouse urges, and covers any false representation which a defendant uses in connection with his goods or services. Utah claims that its interpretation is consistent with the plain language of the statute, with the statutory purposes, with Bernard Food, and with the weight of judicial authority. And it contends that its counterclaim falls clearly within this interpretation of the Act.
Section 43(a) provides, in pertinent part, that
Any person who shall . . . use in connection with any goods or services . . . any false description or representation . . . and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action by any person . . . who believes that he is or is likely to be damaged by the use of any such false description or representation.
Despite its broad language and arguably catholic scope, courts have agreed that this section does not have unlimited application to all deceptive trade practices or to all claims of unfair competition. Alfred Dunhill Ltd. v. Interstate Cigar Co., Inc., 499 F.2d 232, 237 (2d Cir. 1974); Alberto-Culver Co. v. Gillette Co., 408 F.Supp. 1160, 1162 (N.D.Ill. 1976). Instead, it "is directed only against a certain kind of advertising  false representation of goods or service in interstate commerce." 1 Callman, Unfair Competition, Trademarks & Monopolies, § 18.2(b) at 620-21 (3d ed. 1967).
In attempting to define what kinds of false advertising are within the Act, courts have established very few firm guidelines. One limitation which has garnered a strong following is the Bernard Food holding that § 43(a) does not apply to a defendant's misrepresentation about a plaintiff's products. The only other clear trend which emerges from the cases is that the Act covers something more than just trademark misuse and something less than all forms of unfair competition.[7]
We recently described the core concern of the Lanham Act in the following terms:
In a typical Lanham Act action, a newcomer's product or trademark is confusingly similar to that of a well-established competitor. The confusing similarity supports the conclusion that the newcomer is attempting to divert prospective purchasers and `cash in' on its competitor's well-developed reputation in the market. . . . In these cases there is a direct diversion of trade from plaintiff to defendant. Diversion is also likely *408 where defendants use a mark to describe simulated goods in a manner that suggests they are original goods produced by the plaintiff. . . . In both cases the consumer is deceived, either that defendant's product is more reputable than it is, or that simulated goods are the real thing. That deception influences purchasing decisions, and reduces plaintiff's sales volume.
Chromium Industries, Inc. v. Mirror Polishing & Plating Co., 448 F.Supp. 544, 554-55 (N.D.Ill.1978).
However, courts have gradually expanded upon this theme, extending recognition to economic variations in which one or more characteristics of the basic pattern have been diluted or even absent. Thus, the misrepresentations need not be used in an attempt to "palm off" defendant's product as plaintiff's, and need not involve a trademark. Alberto-Culver Co. v. Gillette Co., 408 F.Supp. 1160, 1163 (N.D.Ill. 1976). The statute is not limited to false advertising which compares a defendant's product to a plaintiff's. Id. It proscribes misrepresentations about the quality of defendant's own goods, "even where the misrepresentations do not tend to confuse [his] goods with those of a competitor or otherwise misstate the origin of the goods." Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., 397 F.Supp. 1063, 1072 (W.D.Pa. 1975). It reaches a seller who exaggerates the scope of his patents, thereby creating a false impression that it is the exclusive source of a product, even though there is no misbranding or mislabelling of the article and no misrepresentation of its inherent attributes. Chromium Industries, supra. Finally, § 43(a) covers a publisher of a controlled circulation magazine who falsely inflates the size of his audience and thereby causes reduced advertising revenues to a competing publisher, even though the misrepresentations did not refer in any way to plaintiff's magazine or otherwise expressly take aim at an identifiable competitor. Ames Publishing Co. v. Walker-Davis Publications, Inc., 372 F.Supp. 1 (E.D.Pa.1974).
These decisions implicitly or explicitly recognize that the Act proscribes sales diversions caused by false advertising of defendant's goods, and that those diversions can be equally harmful to competitors regardless of whether the misrepresentations falsely describe defendant's products in isolation or falsely connect its products with plaintiff's products. In either case, there is a "false representation used in connection with goods or services," as required by § 43(a).
We see no principled basis for excluding Utah's counterclaim from the logical thrust of these decisions. The "good" at issue here is uranium, a naturally occurring element. Although uranium can be converted and enriched to increase the concentration and facilitate the use of certain fissionable isotopes, it is hardly possible to misrepresent its inherent ingredients or qualities. After the required transformations are performed, it is the same no matter who produces or sells it. It cannot be misbranded, mislabelled, patented, or trademarked. The primary, if not the sole, difference between competitors' products are 1) price and 2) the certainty and mode of delivery. Consequently, a construction of the Lanham Act which limited its applicability to a) trademark misuse or conduct of a similar nature or b) misrepresentations concerning the inherent qualities of uranium or c) other misrepresentations which trade on the goodwill of competitors, would effectively insulate the uranium market from the protections of the Lanham Act. We believe that the Act should be read, at minimum, to protect competitors from misrepresentations which a defendant makes about its own products and which relate to the principal bases of competition among sellers.[8] These types of misrepresentations *409 are likely to have direct and major impact in diverting sales to the defendants, which is the same effect as that which is produced by trademark misuses and by related conduct which trades on the goodwill of a competitor. By alleging that Westinghouse has misrepresented its uranium supply capability to its utility customers, Utah has framed an actionable misrepresentation within the scope of § 43(a) of the Lanham Act. Westinghouse's motion to dismiss Count III of Utah's counterclaim is denied.
Westinghouse's motions to dismiss the counterclaims filed by defendants Atlas Corporation, Anaconda Company, Kerr-McGee Corporation, Homestake Mining Company, Western Nuclear, Inc., Getty Oil Company, and Utah International, Inc. are denied.
NOTES
[1] Counterclaimants have also defined several relevant submarkets, but both sides have not attached any additional significance to those submarkets for the purposes of the present motions.
[2] This description is drawn from allegations in the counterclaims. See also United Nuclear Corp. v. Combustion Engineering, Inc., 302 F.Supp. 539 (E.D.Pa.1969).
[3] In their memorandum opposing Westinghouse's motion to dismiss, all counterclaimants adopt the cross-subsidization theory.
[4] In its memo, Kerr-McGee does not place itself in the latter category, even though it competed in the fabricated fuel market from 1965 to 1975.
[5] We have struggled to fashion what we believe is an appropriate test because recent Seventh Circuit decisions have created a doctrinal void in this area. In its most recent decision expressly adopting a standing test, the Seventh Circuit seemed to use both the "zone of interests" and "target area" tests. Illinois v. Ampress Brick Co., 536 F.2d 1163, 1164, 1167 (7th Cir. 1976). That decision was reversed by the Supreme Court in an opinion which expressly refrained from addressing the standing issue. Illinois Brick Co. v. Illinois, 431 U.S. 720, 728 n.7, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Seventh Circuit's most recent opinion on standing admits that, because of the Supreme Court reversal, the legal foundation of its standing analysis in Ampress Brick now requires reconsideration, but then finds it unnecessary to select or reject any of the various standing and injury doctrines. Lupia, supra, 586 F.2d at 1169.
[6] Sullivan states that "[I]njured competitor's suppliers, landlord, employees and stockholders . . . [might well be denied standing] unless under the particular circumstances they could show a more immediate relationship to the violation that is typically associated with such status," quoted in Petroleum for Contractors, Inc. v. Mobil Oil Corp., 1978-2 Trade Cases ¶ 62,352 (S.D.N.Y. Nov. 20, 1978).
[7] We agree with Utah that the Seventh Circuit's Bernard Food decision, although quoting the Samson Crane limitations on the Act, was not intended to freeze the statute into so rigid a mold as Westinghouse contends. The quotation is followed by a statement recognizing the Act's applicability to "false or deceitful representations which the manufacturer or merchant makes about his own goods or services" and by a citation to L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d 649 (3d Cir. 1954), where the court rejected the argument that the Act should be limited to trademark misuse or "palming off" of one's goods as those of another. The quotation is best viewed as support for the more narrow holding of Bernard Food, namely, that the Act does not embrace representations made by a defendant about a plaintiff's product. See Skil Corp. v. Rockwell International Corp., 375 F.Supp. 777, 782-86 (N.D.Ill.1973).
[8] On this basis, our decision can be harmonized with such divergent cases as Ames Publishing, supra, where the court applied § 43(a) to misrepresentations concerning magazine circulation, which was the primary basis of competition among controlled circulation publishers, and with Fur Information and Fashion Council, Inc. v. E. F. Timme & Son, Inc., 501 F.2d 1048 (2d Cir. 1974), where the court refused to apply § 43(a) to misrepresentations about the environmental virtues of imitation fur garments, since the inherent qualities of the goods provided the major basis for consumer choice. Because of our limited holding, we find it unnecessary to consider Utah's argument that § 43(a) covers any misrepresentation by a defendant of his merchandise where that merchandise moves in interstate commerce.