**Raymond R. REPP, Plaintiff-Appellant,**

v.

**F. E. L. PUBLICATIONS, LTD., Defendant-Appellee.**

No. 80–2621.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 13, 1981.

Decided May 18, 1982.

Robert V. Jambor, Chicago, Ill., for plaintiff-appellant.

Charles A. Laff, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Senior Circuit Judge, PELL, Circuit Judge, and GRANT,* Senior District Judge.

GRANT, Senior District Judge.

This is an appeal from the dismissal of a nine-count complaint filed on June 26, 1980, by plaintiff-appellant Raymond Repp ("Repp") against defendant-appellee F.E.L. Publications, Ltd. ("FEL"). Repp has narrowed the issue on this appeal solely to the correctness of the district court's decision with respect to Count IX, which alleges violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2, 14. Assuming as true the factual allegations in the complaint and viewing them, and the inferences reasonably to be drawn from them, in the light most favorable to Repp, *see Barany v. Buller,* 670 F.2d 726 (7th Cir. 1982), *Powe v. City of Chicago,* 664 F.2d 639 (7th Cir. 1981) and *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549 (7th Cir. 1980), we affirm.

I.

Repp, a citizen of the State of New York, is a composer and performer who has au-

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

thored numerous original works in the field of liturgical music. FEL, an Illinois corporation whose principal place of doing business is in California, is primarily a publisher and distributor of liturgical music.

On November 7, 1966, Repp entered into an agreement with FEL whereby Repp assigned to FEL all of his rights, including all rights of copyright, in various musical compositions. FEL was also given the right to "market, vend, or otherwise exploit said work or works." In return, FEL agreed to the following:

II In further consideration for, and in full payment of the aforesaid sale, PUBLISHER agrees, in the event of the singular publication by PUBLISHER of the said work or works, in its or their entirety or any part thereof, to pay to AUTHOR as a royalty Ten Per Cent (10%) of the price at which each and every printed copy thereof is sold by PUBLISHER, or caused by PUBLISHER to be sold, which royalty is payable annually during the month of May commencing in the year 1967 during and throughout the period of time that statutory copyright protection thereof is in effect; and PUBLISHER agrees, in the event of the singular sound-recording of said work or works, in its or their entirety or any part thereof, to pay to AUTHOR as a royalty upon each and every sound record, in any form whatsoever, and copies thereof, serving to mechanically reproduce said work, manufactured and sold by PUBLISHER, or caused by PUBLISHER to be manufactured and sold, which royalty shall be payable annually during the month of May commencing in the year 1967, and shall be in accordance with the following schedule:

\*   \*   \*   \*   \*   \*

III In further consideration of the execution of this Agreement, PUBLISHER shall have the sole and exclusive Option privilege hereunder, to publish the aforesaid work or works of AUTHOR herein, in whole or in part, in collective conjunction with the work or works of other authors in a single publication; and PUB-

LISHER agrees that in the event of such collective publication, which may be in any form whatsoever elected by PUBLISHER in the exercise of its sole judgment and discretion, to pay to AUTHOR herein as a royalty, that proportion of Ten Per Cent (10%) of the price at which each and every printed ... copy thereof is sold by PUBLISHER, or caused by PUBLISHER to be sold, which the contribution to said collective publication made by the aforesaid work or works of AUTHOR herein, as determined by PUBLISHER with respect to the number of text or music lines, or both, bears to the aggregate total copyrighted and uncopyrighted content of said collective publication.

IV It is further agreed by and between the parties hereto that any publication by others of the subject work or works in whole or in part, pursuant to the written authorization of PUBLISHER, and resulting in the realization of cash proceeds by PUBLISHER by virtue and in consideration thereof, shall entitle AUTHOR to receive Fifty Per Cent (50%) of such cash proceeds.

In the middle and latter parts of 1967, Repp was "induced" to enter into six other written agreements with FEL which involved the assignment of other musical compositions as well as the personal services of Repp as a performer. (Contracts marked as Exhibits 1 thru 7 and attached to Repp's complaint). Repp emphasizes in paragraphs 10 and 11 of his complaint that prior to this time he had no experience in negotiating contracts while FEL "had been active in the business of publishing and marketing liturgical music for at least two years and possessed substantial knowledge and experience in dealing with contracts for the acquisition of works and the performance of recorded renditions thereof."

Paragraph IV of the November 7 contract provides in part that upon authorization by FEL for others to publish, in whole or in part, Repp's works, Repp would receive from FEL 50% of all cash proceeds realized by FEL in consideration for the

authorization. The six subsequent contracts did not contain this provision. Furthermore, the later contracts, except for the specific recordings of Repp's musical performances already made, empowered FEL to make charges against royalties due Repp to reimburse itself for production and recording costs. Paragraphs 15 thru 19 of the complaint essentially allege that FEL failed to fulfill its obligations under these contracts by not paying Repp the amounts properly due. Those same paragraphs further allege FEL engaged in "threats, intimidation, concealment, and misrepresentations" to obtain the contracts in the first instance.

In 1972, FEL commenced a practice whereby it would grant to individuals or organizations an unlimited license to copy the works of Repp and other composers whose works were assigned to FEL for a blanket annual fee of $100.00. Since the institution of this business practice, sales of Repp's musical creations in printed form and his artistic performances in the form of phono-records have steadily and drastically diminished. Repp alleges that this licensing practice was without authority and directly contrary to the clear meaning and understanding of the contracts. He further alleges that this practice constituted a breach so material and fundamental, and so contrary to the express purposes and objectives of the contracts, as to defeat the intentions of the parties in making the contracts thereby rendering them totally null and void and without force or effect at law. The basis for Repp's allegations is his contention that the licensing practice detracted from and diminished interest in and demand for his works which resulted in lesser royalties being paid to him.

In greater detail, the licensing practice operated as follows. FEL offered approximately 1,145 separate works published and purportedly copyrighted by FEL, in a single lump sum package. The fee to obtain all these works, as noted earlier, was $100.00 annually. It granted the licensee the right to make unlimited copies of the musical works. The licenses were non-negotiable and FEL never made available licenses covering less than all 1,145 works or less than the $100.00 flat fee. One of the more interesting clauses of the annual copy license provided that upon the expiration of the license and a decision by the licensee not to seek renewal, the licensee was required to destroy, within 10 days from the date of expiration, all copies which had been made. *See F. E. L. Publications, Ltd. v. Catholic Bishop of Chicago,* No. 81–1333 (7th Cir. March 25, 1982), for further discussion of the licensing practice. Repp's works have only been marketed and distributed under this licensing practice. As a result, Repp alleges that he has been deprived of revenues which otherwise would have flowed to him had his works not been exclusively distributed through the licensing practice. In other words, demand for his works diminished because interested parties could only obtain his works by also obtaining and paying for other undesired musical works. Repp contends that FEL's licensing practice violates federal antitrust laws.

On October 8, 1980, Repp's action was dismissed in its entirety. The primary reason for the district court's action was that a nearly identical lawsuit was pending in a California state trial court, and Repp was capable of asserting all of his contractual claims there. In reaching its conclusion, the court applied the criteria set forth by the Supreme Court in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). With respect to the federal antitrust law violation claim asserted in Count IX, the court stated:

Repp's remaining attempt to create an illusion of exclusive federal jurisdiction in the form of antitrust violations fails as well. It is true that the remedies provided by the Sherman Act and the Clayton Act are exclusively cognizable in the federal courts. *Hand v. Kansas City Southern Ry. Co.,* 55 F.2d 712, 713 (S.D.N.Y. 1931). Nevertheless, Repp cannot assert that he is entitled [sic] to the remedies provided by these acts, because recovery is limited to those who have been "injured by restraints imposed by defendant

on competitive forces in the economy." *Lupia v. Stell [sic] D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1168 (7th Cir. 1978), *cert. denied,* 440 U.S. 982 [99 S.Ct. 1791, 60 L.Ed.2d 242] (1979). Repp's injuries, if any, are actionable under contract rather than antitrust principles.

Mem.Op. at 5–6. It is from this last action that Repp appeals.

## II.

The issue on this appeal is easily and simply stated: whether Repp has standing to bring this action. Resolution of this issue, however, poses a more difficult task because of the particularly unique problems associated with the "standing" concept in the context of antitrust litigation.

We begin our analysis by reiterating that for purposes of this appeal, we accept as true Repp's claim that FEL's licensing practice constitutes a violation of federal antitrust laws. *But see F. E. L. Publications, supra.* We further accept as true Repp's claim that he has been economically injured as a result of FEL's licensing practice. But such a showing is not enough in itself for a plaintiff to bring an action and invoke the private treble damages remedy provided under 15 U.S.C. § 15 (1976). In order to effectuate the policies underlying the Sherman and Clayton Acts and to refrain from encouraging or permitting lawsuits by a virtually unlimited number of persons who may be even slightly affected by such unlawful and anticompetitive business conduct, various doctrines, the most notable being standing, have been developed to limit the treble damages remedy to those truly intended by the laws to be protected from anticompetitive conduct. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 760–61, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977) (Brennan, J. dissenting); *Reading Industries, Inc. v. Kennecott Copper Corp.,* 631 F.2d 10, 12–13 (2d Cir. 1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981); *TV Signal Company of Aberdeen v. Am. Tel. & Tel.,* 617 F.2d 1302, 1311–12 (8th Cir. 1980) (Henley, J. concurring); *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 17–18 (1st Cir. 1979), *cert. denied,* 446 U.S. 983,

100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *Pollock v. Citrus Associates, etc.,* 512 F.Supp. 711, 717–18 (S.D.N.Y.1981); Sullivan, *Handbook on the Law of Antitrust* § 247 (1977). These same principles were articulated by this court in *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549 (7th Cir. 1980) and *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163 (7th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979) ("It would appear the circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an 'indirect,' 'secondary,' or 'remote' injury." 586 F.2d at 1168). In *Havoco,* we stated:

> The appropriate analysis under the Rule of Reason requires not only that the plaintiff allege and prove anticompetitive effects, but additionally, as with all antitrust claims, that the injury complained of be of a type that the antitrust laws were designed to guard against, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and further that the antitrust violation be the direct cause of plaintiff's injury. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). [cite omitted].

626 F.2d at 556.

As a practical matter, however, the standards of "antitrust injury" and "direct causation" provide little meaningful assistance in determining whether a particular plaintiff has standing. For this reason, courts have developed certain tests, criteria and requirements to assist in the standing determination. The two most widely adopted are the "direct injury" test and the "target area" test. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 760–61, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977) (Brennan, J. dissenting). They were described by Judge Henley in a concurring opinion in *TV Signal Co. of Aberdeen,* 617 F.2d at 1311:

> In general, the direct injury test denies standing in those cases where a third-party victim of the violation comes between plaintiff and defendant, [cites omitted], whereas the target area test asks wheth-

er plaintiff is "within that area of the economy which is endangered by a breakdown of competitive conditions," [cites omitted].

This court has not yet faced the need to adopt one or the other as the prevailing rule in this circuit. In *State of Illinois v. Ampress Brick Co., Inc.*, 536 F.2d 1163 (7th Cir. 1976), we utilized the "target area" test as well as a "zone of interests" analysis. That decision, however, was reversed by the Supreme Court. 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In its opinion, the Court did not reach the standing issue and explained its action as follows:

> Because we find *Hanover Shoe [Hanover Shoe, Inc. v. United Shoe Machinery Corp.]*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 dispositive here, we do not address the standing issue, except to note, as did the Court of Appeals below, [cite omitted], that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4. [cite omitted].

431 U.S. at 728 n.7, 97 S.Ct. at 2065 n.7.

In *Lupia v. Stella D'Oro Biscuit, supra*, the standing issue was again raised before this court, but we declined to adopt any of the generally accepted tests for the reason that the plaintiff would not have prevailed under any of them. Thus, at the present moment, a "doctrinal void" exists in this area. *See In Re Uranium Antitrust Litigation*, 473 F.Supp. 393, 401 n.5 (N.D.Ill.1979). However desirable it might be for this court to expressly adopt a standing test, it would be imprudent for us to do so in this case because Repp would not have standing whichever is applied.

Under the "target area" test, the key inquiry is to identify, from the perspective of the alleged violator, the persons or entities at whom the challenged business practice was primarily directed and the purpose for which the practice was instituted. Only then can a person or entity be characterized as "secondary" or "remote" to the main line

of anticompetitive effects. The licensing practice employed by FEL was a marketing and distribution practice. Its prime objective was to increase revenues under the familiar "tying" theory that low-in-demand musical works could be sold on the "coattails" of high-in-demand musical works. *See In Re Uranium Antitrust Litigation*, 473 F.Supp. at 401–02. The targets FEL had in mind when it developed and instituted this practice were prospective purchasers and users of the musical works, not the sources of those works. The manner or method by which FEL obtained ownership or distribution rights to those works which would be licensed was not a concern. The licensing practice was developed with an established fact being that FEL owned or would own the copyrighted works. The users and purchasers were the sole targets of the licensing practice because only they could influence FEL's revenues which, as noted above, was the prime objective of licensing. Decreasing royalties to suppliers of musical works was not the benefit sought by FEL from licensing. That Repp and other suppliers may have suffered decreased royalties does not change the plain fact that FEL's licensing practice was directed toward users of the musical works and not suppliers.

Our conclusion is borne out by Justice Stevens' dissenting opinion in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 25, 99 S.Ct. 1551, 1565, 60 L.Ed.2d 1 (1979). Applying a rule of reason analysis to a blanket all-or-nothing license nearly identical to FEL's, Justice Stevens makes clear his belief that users of the license were those who were primarily injured by the anticompetitive practice.

> The blanket all-or-nothing license is patently discriminatory. The user purchases full access to ASCAP's entire repertoire, even though his needs could be satisfied by a far more limited selection. The price he pays for this access is unrelated either to the quantity or the quality of the music he actually uses, or, indeed, to what he would probably use in a competitive system. Rather, in this unique

all-or-nothing system, the price is based on a percentage of the user's advertising revenues, a measure that reflects the customer's ability to pay but is totally unrelated to factors—such as the cost, quality, or quantity of the product—that normally affect price in a competitive market. The ASCAP system requires users to buy more music than they want at a price which, while not beyond their ability to pay and perhaps not even beyond what is "reasonable" for the access they are getting, may well be far higher than what they would choose to spend for music in a competitive system. It is a classic example of economic discrimination.

The record plainly establishes that there is no price competition between separate musical compositions. Under a blanket license, it is no more expensive for a network to play the most popular current hit in prime time than it is to use an unknown composition as background music in a soap opera. Because the cost to the user is unaffected by the amount used on any program or on all programs, the user has no incentive to economize by, for example, substituting what would otherwise be less expensive songs for established favorites or by reducing the quantity of music used on a program. The blanket license thereby tends to encourage the use of more music, and also of a larger share of what is really more valuable music, than would be expected in a competitive system characterized by separate licenses.

441 U.S. at 30 -32, 99 S.Ct. at 1568 (footnotes omitted). He goes on to add that composers may be adversely affected by the licensing practice but in a particular manner.

And since revenues are passed on to composers on a basis reflecting the character and frequency of the use of their music, the tendency is to increase the rewards of the established composers at the expense of those less well known. Perhaps the prospect is in any event unlikely, but the blanket license does not present a new songwriter with any opportunity to try to break into the market by offering his product for sale at an unusually low price. The absence of that opportunity, however unlikely it may be, is characteristic of a cartelized rather than a competitive market.

*Id.* at 32–33, 99 S.Ct. at 1568–1569 (footnotes omitted). This injury, however, is not the injury being alleged by Repp. His paramount claim is that he is receiving less money under FEL's licensing practice than he would under another form of marketing and distribution. He does not claim that he is being denied the opportunity of entering the market with musical works that he has not transferred in whole or in part to FEL. His access to the marketplace with musical works *he owns* is unaffected. Thus, Repp falls outside the range of economic injuries intended to be protected by a declaration that the licensing practice is unlawful. For all of these reasons, we must characterize any injuries suffered by Repp as "indirect," "secondary" and "remote" and not of the type that the antitrust laws were intended to protect.

Repp relies heavily upon the Ninth Circuit's decision in *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), where the court permitted an action to proceed in a factual context very similar to that in this case. *See also Laughlin v. Wells,* 446 F.Supp. 48 (C.D.Cal.1978). We find more persuasive, however, the reasoning of the district court in *Fields Productions, Inc. v. United Artists Corp.,* 318 F.Supp. 87 (S.D.N.Y.1969), *aff'd without opinion,* 432 F.2d 1010 (2d Cir. 1970), *cert. denied,* 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971), which reached a conclusion opposite to *Mulvey.* Repp attempts to distinguish *Fields Productions* by stressing that the contract there between the producer and distributor contained an express provision against block booking and that the action of the distributor was unquestionably in direct breach. We do not find this distinction persuasive nor do we agree with Repp that the contractual prohibition of block booking was the basis for the court's decision.

FEL had certain duties under its contracts with Repp with respect to the marketing, vending and distribution of his musical works. Those duties may not have been as clearly set forth as they were in *Fields Productions* but nevertheless do exist as implied obligations. What those obligations specifically entailed and whether FEL's licensing practice constituted a breach of those obligations is a matter of contractual interpretation better left to the pending state action. It is possible that FEL's unilateral institution of the all-or-nothing licensing practice was a breach of contract which entitles Repp to recover damages. But this question is not one arising under the federal antitrust laws. Its resolution is better left in this instance to the California state court which can examine all of the contracts in question. Repp's proper and fully adequate remedy is under contract and not federal antitrust law. We find particularly applicable to this case the conclusion of Judge McLean in *Fields Productions*:

> Moreover, in this case it is difficult to see how the block booking could have caused injury to plaintiff, incidental or not. Plaintiff's grievance seems to be that it was not allocated a fair share of the total receipts from the block. The cause of plaintiff's damage, therefore, was the improper allocation, not the block booking. This may be a breach of contract, but it is not a violation of the antitrust laws. Plaintiff is already suing defendant for breach of contract, initially in this court and now in the state court. That would seem to be plaintiff's proper remedy. I can see no justification for trebling any damages to which plaintiff may be entitled.

318 F.Supp. at 88.

The "direct injury" test reaches this same result with essentially the same analysis. Indeed, although the tests are treated as separate and distinct, the economic analyses with respect to each do not materially differ. The primary parties to the licensing agreement are FEL and the licensee. All other parties affected by the licensing practice, and they not only include composers, are collateral and third-party victims. Repp's injuries are not directly attributable to the licensing practice. The source of Repp's right not to be deprived of royalties due him is his contract with FEL and not the federal antitrust laws. His injuries are not immediately related to the licensing practice but rather to the obligations and responsibilities assumed by FEL by contract. We cannot overlook the fact that Repp himself appears to realize this by the substance of his complaint which predominantly sounds in contract. Of course, as did the court in *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980), we do not suggest that a breach of contract under state law can never constitute a violation of the antitrust laws. But in this case, for all of the reasons discussed, Repp's injuries are beyond the reach of these laws.

The judgment of the district court is Affirmed.