**WARNER MANAGEMENT CONSULTANTS, INC., an Illinois corporation, Plaintiff,**

v.

**DATA GENERAL CORPORATION, a Delaware corporation, and Centennial Systems, Inc., a Maryland corporation, Defendants.**

**No. 80 C 4697.**

United States District Court, N. D. Illinois, E. D.

Aug. 16, 1982.

958

Peter Connor, Gareth Morris, James K. Gardner, Donald J. Kreger, Robert J. Rubin, Rowe W. Snider, Friedman & Koven, Chicago, Ill., William M. Goldstein, Urbana, Ill., for plaintiff.

Thomas Johnson, Juris Kins, Chicago, Ill., Robert H. Koehler, Garret G. Rasmussen, Patton, Boggs & Blow, Washington, D. C., Donald E. Tolva, Martin, Craig, Chester & Sonneschein, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Plaintiff, Warner Management Consultants, Inc., ("Warner") was in the business of distributing computer systems and providing computer consulting services to those in the market for computers and computer-related services. The computer systems Warner provided its customers consisted of "hardware," the central processing unit and peripheral units, such as printers and card punches, and "software," the computer programs. First Amended Complaint ¶ 4. Warner was a "middleman;" it purchased computer systems and related services from various suppliers, and resold them to the ultimate consumers.

Defendant, Data General Corp., ("Data General") was one of Warner's suppliers. Data General had entered a number of Original Equipment Manufacture ("OEM") agreements with Warner in which Data General contracted to sell hardware to War-

ner for resale to ultimate consumers. *Id.* ¶ 5. Warner found its relationship with Data General to be highly satisfactory, and continued to purchase hardware from Data General. Over time, Warner developed an extensive collection of software suited to Data General's central processing units, expertise regarding the costs, capabilities and programming of Data General's products and a substantial amount of goodwill in the market as consumers learned of its growing reputation for being able to supply reliable Data General products. As a result, Data General's hardware became "uniquely desirable" as far as Warner was concerned. *Id.* ¶¶ 14–18.

In late 1978, Warner learned that certain peripheral hardware, such as printers and card punches, could be purchased more cheaply from Data General's competitors than from Data General itself. *Id.* ¶ 19. In order to prepare the least expensive and hence most attractive package for its customers, Warner prepared bids based on the prices of non-Data General peripheral components to be matched with Data General central processing units. Warner's bids also factored in the cost of obtaining financing for the sale from a computer leasing company. *Id.* ¶¶ 21–22.[1] In particular, Warner bid on a contract for a series of computer packages for the United States government utilizing these cost factors and was told, based on the government's satisfaction with its initial bid, that Warner was eligible to submit a "best and final bid." *Id.* ¶¶ 20, 23.

The complaint alleges that at some point no later than early 1979 Data General decided to condition the sale of its hardware upon the agreement by the purchaser of the hardware (a) to obtain financing from defendant. Centennial Systems, Inc. ("Centennial"), a computer leasing company, (b) to purchase computer maintenance services from Data General and (c) to purchase certain peripheral hardware distributed by

Data General, but not manufactured by Data General. Data General allegedly combined, conspired and contracted with Centennial to impose this scheme of conditional sales upon purchasers of its hardware. *Id.* ¶ 12. When Data General learned that Warner's bids did not include financing from Centennial and peripheral hardware and maintenance services purchased from Data General, it engaged in a course of conduct designed to compel Warner to purchase maintenance services and peripheral hardware from Data General and to obtain financing from Centennial.

Specifically, Data General refused to perform its contractual obligation to deliver central processing units to Warner, and Centennial refused to provide financing to Warner. *See id.* ¶¶ 24–27. Eventually, Warner capitulated and agreed to Data General's demands. Since the financing provided by Centennial and the maintenance services and peripheral hardware provided by Data General were more expensive than that which Warner could have obtained elsewhere, Warner's prices went up substantially. Once its prices went up, Warner found that it was no longer able to compete in the market for computer systems. It lost numerous contracts, including the lucrative government contract, and eventually was driven out of business. Warner then filed this lawsuit against Data General and Centennial. This court's jurisdiction rests on 28 U.S.C. §§ 1331, 1332, 1337 (1976 and Supp. IV 1980) and 15 U.S.C. § 15 (1976).

In count I of the complaint, Warner alleges that Data General and Centennial's scheme of conditional sales constitutes a tying arrangement, wherein the sale of hardware (the tying product) was tied to the purchase of credit, maintenance services and peripheral hardware (the tied products). The arrangement, Warner alleges, is per se unlawful under § 1 of the Sherman

1. Apparently, it is the custom in the computer industry that sales of computer systems are arranged as a sale of the system by the manufacturer to the bidder, here Warner. The bidder's purchase is financed by a computer leasing company who purchases, at a discount, the bidder's right to receive rental payments on the system from the party to whom the bidder plans to lease the equipment. Thus, Warner did not actually "resell" computer systems, but rather bought the systems from suppliers and then leased them to the "ultimate consumers."

Act[2] and § 3 of the Clayton Act.[3] In count II, Warner alleges that tying arrangement, even if not per se unlawful, nevertheless is an unlawful restraint of trade under § 1. In count III, Warner alleges that the restraint of trade also violates the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, § 60–3 (1979). In count IV, plaintiff alleges that Data General's conduct in attempting to persuade Warner to accede to the tying arrangement included defamatory statements regarding Warner made to Warner's customers in an attempt to coerce Warner to agree to the tie. These statements, it is alleged, are actionable under the common law of commercial defamation. Count V alleges that, as part of its coercive scheme, Data General maliciously interfered with Warner's contractual relations with its customers. Finally, in count VI, Warner alleges that Data General breached its contract to deliver computer systems to Warner. Data General has moved to dismiss counts I, II and III on the ground that Warner lacks standing to raise antitrust claims since it never actually bought the tied or tying products from Data General. Centennial has also moved to dismiss the antitrust claims, which are the only claims involving Centennial, on standing grounds, and also on the ground that Centennial was not involved in the tying alleged in the complaint.

Private parties have been accorded the right to bring an action for damages under the antitrust laws by § 4 of the Clayton Act, which provides,

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

15 U.S.C. § 15 (1976). The antitrust standing issues raised by the parties require a determination whether Warner qualifies as a person entitled to sue under § 4.[4]

■ The law of antitrust standing is something less than a seamless web. In fact, as we have had occasion to observe previously, this area of the law is rife with "doctrinal confusion." *In re Uranium Antitrust Litigation*, 473 F.Supp. 393, 401 (N.D. Ill.1979).[5] However, our analysis is aided by the Supreme Court's recent opinion in *Blue Shield of Virginia v. McCready*, —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), which clarifies somewhat the analysis required under the rubric of antitrust standing. The Court identified two types of limitations on the ability of private par-

---

**2.** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .
 15 U.S.C. § 1 (1976).

**3.** It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller,

where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.
 15 U.S.C. § 14 (1976). The parties do not raise the question whether this case involves "goods, wares, merchandise, machinery, supplies or other commodities" within the meaning of the Clayton Act.

**4.** The initial inquiry demanded by the statute is whether the plaintiff has been "injured in his business or property." Here there is no dispute that Warner has suffered injury to its business or property within the meaning of the Clayton Act.

**5.** The court of appeals for this circuit shares our assessment. *See In re Industrial Gas Antitrust Litigation*, 681 F.2d 514, at 515 (7th Cir. 1982).

ties to sue under the antitrust laws which are embodied in the law of antitrust standing. A party seeking to recover damages must demonstrate first that it is an appropriate party to bring suit and second that it has suffered a direct injury of the type that antitrust laws were intended to recompense. *See* 102 S.Ct. at 2545–48.

■ The first limitation identified by the Court attempts to filter out claims which, if permitted, would lead to unfair or unworkable results. For example, this doctrine prevents indirect purchasers of goods from recovering higher prices which they have been forced to pay because of antitrust violations, since allowing the indirect purchasers a right of recovery in addition to the recovery already permitted direct purchasers under § 4 would create an intolerable risk of duplicative recoveries, *see McCready*, 102 S.Ct. at 2546; *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730–31, 97 S.Ct. 2061, 2066–2067, 52 L.Ed.2d 707; and because it would be difficult if not impossible to determine the amount of damages due to the difficulty of tracing the higher prices charged by the original seller through to the price paid by the indirect purchaser, *see id.* at 731–32, 741–45, 97 S.Ct. at 2067, 2072–2074. Similarly, a state cannot sue to recover damages to its economy caused by antitrust violations because of the difficulty of measuring those damages and the risk of double recovery such actions would create, *see McCready*, 102 S.Ct. at 2546; *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

■ Defendants argue that these considerations support a denial of standing to Warner, since Warner never purchased either the tied or the tying product. They argue that it would be unfair and unworkable to permit every person who "attempted" to purchase or "considered" purchasing a tied product to sue under the antitrust laws. However, the complaint alleges that Warner would have successfully bid on a number of contracts but for defendants' tying arrangement, and further alleges that this arrangement caused the lost orders, which in turn led to Warner's loss of profits and goodwill. Warner seeks to recover by proving damages resulting from specific orders it would have filled but for the tie. Warner does not seek to allow "any" person who considered buying a tying product to sue, but rather only a person who can prove, as Warner seeks to, that it would have bought defendants' products and then been able to resell them at a profit but for the tie. Warner's damages are not unworkably difficult to measure; they are limited to the specific contractual profits and goodwill lost as a result of the tie. Neither is there any risk of duplicative recovery. No one but Warner can recover damages for the contracts Warner can prove it would have obtained but for the tie. If other entities can prove that they would have purchased Data General products and then profitably resold them but for the tie, they too can recover, but that recovery in no way duplicates Warner's recovery for contracts lost because of the tie. A separate recovery for every contract lost to customers of Data General because of the tie is entirely appropriate. The absence of any risk of unfair or unworkable recoveries means that this element in the law of standing does not argue against entertaining Warner's claim. *See McCready*, 102 S.Ct. at 2546.

■ The second element of antitrust standing is that plaintiff must suffer a direct injury of the type the antitrust laws were meant to recompense. It is this area where most of the "doctrinal confusion" is found, and where this case becomes difficult. This element has two distinct components. The first is that plaintiff must be directly injured by those conditions within the market affected by defendants' conduct; and the second is that plaintiff's injury must be of a type that reflects the sort of injury the antitrust laws were designed to prohibit. *See McCready*, 102 S.Ct. at 2548–51; *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir. 1982); *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1168–69 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). The *McCready* Court elaborated,

[W]e [must] look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and, (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

102 S.Ct. at 2548.

■ We first examine the nexus between the alleged violation and the harm suffered by Warner. The law in this circuit is that a sufficient nexus is established if the plaintiff is within the "target area" of the antitrust violation. *See In re Industrial Gas Antitrust Litigation*, 681 F.2d 514, at 517–519 (7th Cir. 1982).[6] "The target area test focuses on the area affected by the anticompetitive conduct, requiring that the plaintiff be within the area of the economy which was endangered by a breakdown of competition and that plaintiff's injury be a direct result of the lessening of that competition." *Id.*, at 516.[7]

■ It is alleged that defendants sought to impose their tying arrangement on the market for their computer systems by requiring Warner to pay artificially high prices for tied products. Warner was thus as direct a "target" as there could possibly be. It is well-settled that direct purchasers of a product the price of which has been inflated by anticompetitive conduct have standing to sue under the antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Hanover Shoe Co. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Berkey Photo, Inc., v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Bogus v. American Speech v. Hearing Association*, 582 F.2d 277, 286 (3d Cir. 1978). Thus, a distributor of goods, such as Warner, who has had to absorb increased costs due to anticompetitive conduct by the manufacturer, has standing under § 4. *See Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3, 12 n.7 (1st Cir. 1977), *aff'd*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); *Robbins Flooring, Inc. v. Federal Floors, Inc.*, 1978–2 Trade Cas. (CCH) ¶ 62,259 at 75,618–19 (E.D.Pa.1977). As a consumer of goods the price of which was allegedly unlawfully increased by a tying arrangement, Warner was within the area of the economy endangered by the anticompetitive practice and satisfies the "target area" test. *See McCready*, 102 S.Ct. at 2549. Neither was the injury to Warner indirect. The tying arrangement depended upon increasing the prices paid by Warner. "The harm to [Warner] was clearly forseeable; indeed, it was a necessary step in effecting the illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely "'the type of loss that the claimed violations ... would be likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)).

■ Defendants argue that whatever Warner's status had it made purchases under the tying arrangement, the fact that Warner in fact did not make any purchases

---

**6.** In *Repp v. F.E.L. Publications, Ltd.*, 688 F.2d 441 at 444–445 (7th Cir. 1982), the court of appeals indicated that this circuit had not yet chosen between the "target area" and the "direct injury" tests. Nevertheless, in *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir. 1982), the court took it as well-settled that this circuit has adopted the target area test. We will assume that the more recent case, *Industrial Gas*, is the one we should follow, though it may not make much difference, in light of the *Repp* court's observation, *see* at 520, that there is little difference between the two tests.

**7.** While *McCready* did not explicitly endorse the "target area" test, its analysis seems to track that of the "target area" test. *See* 102 S.Ct. at 2549 (Citing with approval *Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 129 (9th Cir. 1973) in which the court adopted the "target area" test).

means it is outside of the "target area."[8] However, defendants' tying arrangement was clearly aimed at Warner; defendants allegedly attempted to impose a tie on Warner by requiring Warner to incorporate the tie into its contracts with defendants. The fact that Warner made no tied purchases is not determinative, as the Sixth Circuit recognized in *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150 (6th Cir. 1980). There, plaintiff Ware sought to rent space in a mobile home park near his job, but was told that space would only be rented if he also purchased a mobile home. Rather than agreeing to the tie, Ware rented an apartment near his job while also renting parking space for his mobile home elsewhere. Ware sought to recover damages for having to rent an apartment and parking space simultaneously. The court held that Ware had antitrust standing to challenge the tie despite his failure to purchase under the tying arrangement.

> Captain Ware has alleged a wrongful deprivation of money by having to pay double rent for the apartment and mobile home rental space. He incurred this loss because of Trailer Mart's anticompetitive conduct in tying homesite leases to trailer purchases. We therefore find Ware has properly claimed an injury under Section 4 and may, accordingly, sue to recover damages for the alleged violations of Section 1 of the Sherman Act.

*Id.* at 1153. Moreover, in *McCready* both the majority and three of the dissenters acknowledged that a distributor who lost a retailer's business because he refused to go along with the retailer's anticompetitive conspiracy would have an action against the retailer, despite the fact that the distributor was no longer doing business with the re-

tailer. *See* 102 S.Ct. at 2551 n.21; *id.* at 2554 (Rehnquist, J., dissenting). In both cases, the plaintiff has suffered compensable antitrust injury despite its failure to purchase goods under an anticompetitive scheme.

Here, Warner suffered reduced demand for its products because defendants required Warner to attempt to sell computer systems under a tying arrangement. Warner sought to compete in the market for computer systems, but was prevented from successfully doing so because defendants sought to impose a tying arrangement in the market. Warner's injury to its ability to compete in the markets for the tied and tying goods because of defendants' anticompetitive scheme, which reduced the demand in those markets for its products, is an antitrust injury sufficient to accord Warner standing. *See Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309, 1311 (5th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1358–61 (5th Cir. 1976); *Columbia Pictures Industries, Inc. v. Moyer*, 1981–1 Trade Cas. (CCH) ¶ 63,878 at 75,553–54 (D.Ore.1981); *DeGregorio v. Segal*, 443 F.Supp. 1257, 1261–62 (E.D.Pa. 1978).

Accepting defendants' position would create the anomalous result that if defendants had been a little less greedy and not charged Warner so much money for the tied products that Warner's prices became non-competitive, Warner would have been able to sell some tied computer systems, and would have had standing to challenge the tie. Yet, since defendants went too far, and drove Warner out of the market altogether, defendants would have us deny

---

**8.** In the usual case where a distributor refuses to purchase goods under a tying arrangement, there will be no cause of action on the merits. The unsuccessful attempt to impose a tie will usually be merely unilateral action and there will be no "contract, combination or conspiracy" within the meaning of the Sherman Act, and no "contract" within the meaning of the Clayton Act. Here, however, the nonpurchasing plaintiff does seem to have a claim on the merits, because it has alleged an agreement between Data General and Centennial and possibly also an agreement between itself and the defendants to attempt to sell computer systems under the tying arrangement. Thus, this is the relatively unusual case where a nonpurchasing plaintiff can allege an agreement which brings the case within the ambit of the Sherman and Clayton Acts, and so we must reach the question whether the plaintiff has standing to challenge the agreement.

Warner standing. By imposing the tie, defendants reduced demand in the market for their computer systems, and drove a distributor in the market, Warner, out of business altogether. Contrary to defendants' assertions, not only was Warner in the "target area," but also "was aimed at, hit, and destroyed." Memorandum in Opposition to Data General Corporation's Motion to Dismiss at 18 (emphasis deleted).

 We now turn to the question whether the injury Warner alleges is the type which Congress intended to recompense under the antitrust laws. In order to satisfy this test, an antitrust plaintiff such as Warner

> must prove more than injury casually linked to an illegal presence in the market. Plaintiff must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive acts made possible by the violation.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original). However, it is clear that the mere fact that Warner did not purchase computer systems at increased prices does not mean it did not suffer an injury of the type the antitrust laws may redress. "[W]hile an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress, that is not the only form of injury remediable under § 4." *McCready*, 102 S.Ct. at 2550 (citation omitted). We must examine Warner's alleged injury to see if it "reflect[s] the anticompetitive acts made possible" by unlawful tying arrangements.

 In count I of the complaint, Warner challenges the tying arrangement involved in this case as per se unlawful under the Sherman and Clayton Acts. The

reason tying has been condemned under a per se rule is that it allows a competitor with market power in the market for the tying product to expand that power into the market for the tied product by conditioning purchase of the one on simultaneous purchase of the other. This predatory use of market power is the evil thought to justify per se illegality. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620–22, 97 S.Ct. 861, 867–868, 51 L.Ed.2d 80 (1977); *United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).[9] Of course, it follows that where there is no injury which reflects the presence of market power, the dangers associated with tying are absent and there is no justification for per se condemnation. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 622, 97 S.Ct. 861, 868, 51 L.Ed.2d 80 (1977); *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 32 (7th Cir. 1976); *In re Uranium Antitrust Litigation*, 473 F.Supp. 393, 402 (N.D.Ill. 1979). *See also Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.*, 535 F.Supp. 225, 230–31 (S.D.N.Y.1982) (where injury does not reflect use of market power against plaintiff, plaintiff lacks standing). Justice Black, writing for the Court, elaborated,

> Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.

---

**9.** A tying arrangement is per se unlawful under the Clayton Act if the seller has market power in the tying product, or if a substantial volume of commerce in the tied produce is restrained. If both these elements are present, the tie is

also per se unlawful under the Sherman Act. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 608–09, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953).

*Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6–7, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958).

█ Market power is defined as the ability of a seller to force buyers to pay a noncompetitive price for its goods. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502–04, 89 S.Ct. 1252, 1258–1259, 22 L.Ed.2d 495 (1969). Here, the complaint reveals that no one would buy computer systems from Warner at the prices demanded by Data General under the tying arrangement. Data General could not compel purchasers of computer systems to pay noncompetitive prices. By definition, then, Data General had no market power. The fact that Warner's injury does not involve purchases does not in itself defeat Warner's standing, but the reason Warner made no purchases does. Warner's injury, inability to sell computer systems at the price imposed by Data General, reflects a lack of market power, and not the sort of injury that the antitrust laws' per se prohibition on tying was meant to redress.[10] This injury did not restrain competition in either the markets for the tied or tying products. To the contrary, the tying arrangement merely thrust purchasers of computer systems into the marketplace, to

deal with Warner's competitors. That is not an antitrust injury. *See Central Chemical Corp. v. Agrico Chemical Co.*, 531 F.Supp. 533, 542–43 (D.Md.1982).[11] Because the injury suffered by Warner does not reflect an anticompetitive use of market power, Warner lacks standing to challenge the tying arrangement as per se unlawful.[12]

█ However, the fact that Warner lacks standing to mount the per se antitrust attack contained in count I does not mean that it also lacks standing to challenge the tying arrangement as an unreasonable restraint of trade in counts II and III. Even if a plaintiff cannot demonstrate the presence of a per se unlawful tie reflecting predatory use of market power, it may still challenge the tie under the rule of reason. *See Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 499–500, 89 S.Ct. 1252, 1256–1257, 22 L.Ed.2d 495 (1969); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614–15, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). Under the "rule of reason," the test is whether, in light of all the attendant facts and circumstances, the challenged practice unreasonably suppresses competition in the relevant

---

**10.** Interestingly, a court recently overturned a jury verdict against Data General in a case involving allegations similar to those made here on the ground that no reasonable jury could conclude that Data General had market power. *See In re Data General Corp. Antitrust Litigation*, 529 F.Supp. 801 (N.D.Cal.1981).

**11.** For a contrasting view, see Reisner v. General Motors Corp., 1977–2 Trade Cas. (CCH) 62,575 (S.D.N.Y.1978), *aff'd on other grounds*, 1982–1 Trade Cas. (CCH) 64,542 (2d Cir. 1982).

**12.** Warner argues that Data General had market power, at least over it, since the experience and goodwill that Warner had developed with respect to Data General products made those products "uniquely desirable" to it. Warner misunderstands the concept of market power associated with uniqueness.

Uniqueness confers economic power only when competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented or copyrighted products, or physical, as when the product is land. It is true that the barriers may also be economic, as when competitors are simply unable to

produce the distinctive product profitably, but the uniqueness test in such situations is somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it.

*Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 505 n.2, 89 S.Ct. 1252, 1259 n.2, 22 L.Ed.2d 495 (1969). Here, the fact that no one was buying Data General's computer systems means there must have been readily available substitutes. The fact that Data General products were uniquely desireable to *Warner* does not reflect market power, but merely that Warner made a bad business decision in committing itself to a computer manufacturer that charged noncompetitive prices. *See Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1362 (5th Cir. 1980) ("The fact that Radio tended to concentrate its sales to G–II installers (that is, Associated) is not probative of the existence of a separate market. It may only reflect a business choice made by Radio to so limit its business."), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981).

market. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 689–91, 98 S.Ct. 1355, 1364–1365, 55 L.Ed.2d 637 (1978). Thus, we must determine whether Warner has alleged the type of injury which can be redressed under the rule of reason.

The tie which defendants imposed on Warner prohibited it from obtaining financing, maintenance services and peripheral hardware from defendants' competitors. The competitive injury classically associated with tying arrangements is that purchasers, such as Warner, are precluded from entering the market for competing tied products. *United States v. Loew's, Inc.*, 371 U.S. 38, 44–45, 83 S.Ct. 97, 101–102, 9 L.Ed.2d 11 (1962); *Times-Picayune Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). As a result, competitors and purchasers in the market for the tied product are injured by the tying arrangement. *See Repp v. F.E.L. Publications, Ltd.*, 688 F.2d 441 (7th Cir. 1982); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977); *Southern Concrete Co. v. United States*, 535 F.2d 313, 316–17 (5th Cir. 1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *Consolidated Terminal Systems, Inc. v. ITT World Communications Systems, Inc.*, 535 F.Supp. 225, 230–31 (S.D.N.Y.1982); *In re Uranium Antitrust Litigation*, 473 F. Supp. 393, 402 (N.D.Ill.1979); *Kelly v. General Motors Corp.*, 425 F.Supp. 13, 17 (E.D.Pa.1976). Here, Warner was a purchaser of the tied items, and the tying arrangement prevented it from entering the market for the tied items.[13] Thus, the injury alleged by Warner is characteristic of the injury that a rule of reason challenge to a tying arrangement addresses. Warner has standing to mount a reasonableness challenge to defendants' conduct in count II and III of the complaint.[14]

Since the only issues Data General raises involve standing, the preceding discussion resolves Data General's motion to dismiss. However, Centennial has raised two issues unique to it which must be separately addressed.

First, Centennial argues that the tying arrangement involving it cannot be actionable, since Data General has no financial stake in Centennial's tied sales. Warner responds that no such stake is required, and even if it is, Data General did have a financial interest in Centennial's tied sales of credit.

Warner's position that a tying claim can be brought where the seller of the tying goods has no financial interest in the sales of the tied items is without support. Where the seller of the tying goods has no interest in the sale of the tied goods, then it is not using its power in the market for the tying item to invade a second market; the sales of the tied goods are independently priced by a separate financial entity who presumably has no power to charge a noncompetitive price. Under such circumstances, tying poses no danger to competition, and courts have universally held that such tying is not actionable. *See Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 456 (5th Cir. 1979); *Ohio-Sealy Mattress Manu-*

---

**13.** Data General argues that lost profits and goodwill are not actionable because they are not the type of injury the antitrust laws were meant to recompense. Here, however, the loss of contracts, and defendants' alleged attempts to coerce Warner to accept the tie by failing to deliver goods and disparaging Warner to its customers were an integral part of the tying scheme. These acts were designed to force Warner to accede to defendants' anticompetitive course of dealing. Compensating plaintiff for losses incurred because they refused to go along with an anticompetitive scheme is one of the basic aims of antitrust laws. This much was recognized by *McCready* where, as noted above, the Court recognized damages incurred because of a distributor's refusal to go along with an anticompetitive scheme are recoverable.

**14.** In light of Data General's lack of market power, and Warner's inability to sell the tied computer systems, it may very well be that the tying arrangement here had no impact on competition in the relevant market and that Warner will lose on the merits. However, the parties have only raised the issue of standing. Since it may be possible for Warner to prove some effect on competition even in the absence of sales, we will not reach the merits at this juncture.

*facturing Co. v. Sealy, Inc.*, 585 F.2d 821, 834–35 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377 n.9 (5th Cir. 1977); *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309, 1317–18 (3d Cir. 1975); *Crawford Transport Co. v. Chrysler Corp.*, 338 F.2d 934 (6th Cir. 1964), *cert. denied*, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965); *Nelligan v. Ford Motor Co.*, 262 F.2d 556 (4th Cir. 1959); *Miller Motors, Inc. v. Ford Motor Co.*, 252 F.2d 441, 446 (9th Cir. 1958); *Roberts v. Elaine Powers Figure Salons, Inc.*, 1981–1 Trade Cas. (CCH) 63,976 (E.D.Cal. 1980); *Shaeffer v. Collings*, 1980–81 Trade Cas. (CCH) ¶ 63,666 at 77,576 (E.D.Pa.1980); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 491 F.Supp. 1199, 1209 (D.Haw.1980); *Rodrigue v. Chrysler Corp.*, 421 F.Supp. 903, 904–05 (E.D.La. 1976); *BBD Transportation Co. v. United States Steel Corp.*, 1976–2 Trade Cas. (CCH) ¶ 61,709 at 69,874 (N.D.Cal.1976); *Mid-America ICEE, Inc. v. John E. Mitchell Co.*, 1973–2 Trade Cas. (CCH) ¶ 74,681 at 94,990–91 (D.Ore.1973).

■ Centennial has submitted an affidavit indicating that Data General has no financial interest in the tied sales of credit made by Centennial. *See* Affidavit of William C. Thompson. However, the complaint does allege a financial interest: the tied maintenance services purchased from Data General would be subcontracted to Centennial. Amended Complaint ¶ 27(c). Presumably, Data General would receive a discount on the subcontract for maintenance services in return for requiring Warner to obtain financing from Centennial. That would give Data General a stake in Centennial's tied sales. Moreover, Warner has submitted affidavits indicating that Data General explicitly told Warner that it would receive central processing units only if it obtained financing from Centennial. Affidavit of Gary Tauss; Affidavit of Henry A. Warner. Experience suggests that when one business promotes another, there is likely to be some financial incentive motivating the promotion. If Data General would

have received financial benefits as a result of Centennial's tied sales, the tying would be actionable. *See Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc*, 585 F.2d 821, 834–35 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977). Most of the evidence regarding the details of Data General and Centennial's financial arrangements are in the control of the defendants. In light of Warner's plausible allegation, supported by affidavits, of a financial relation between Data General and Centennial's tied sales, and the disfavor in which summary judgment is held in antitrust cases where the proof is in the hands of the conspirators, *see Hospital Building Co. v. Trustees of Rex. Hospital*, 425 U.S. 738, 746–47, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1975); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), we think that Warner's tying claim involving Centennial merits further factual development and should not be dismissed at this stage in the proceedings.

■ Finally, Centennial contends that it cannot be liable because it was an "innocent" member of the scheme since all the unlawful acts alleged in the complaint regard Data General's attempts to impose a tie on Warner. Centennial was merely an "innocent" conduit in Data General's scheme.

Upon examination, Centennial's claim of "innocence" does not hold up. The complaint alleges that Data General and Centennial agreed to impose a tie on Warner. If that was an unlawful agreement then all parties to it are liable. The fact that the seller of the tied and tying items are two distinct entities is no defense.

While the more common form of tying agreement is one whereby plaintiff agrees with a single defendant to buy both "A" and "B" from that defendant, the form we see alleged here—where plaintiff, by a contract with one defendant, is required to buy the tied product

from a legally separate but either controlled or controlling defendant—also is condemned by the antitrust laws. In such cases, if the tying agreement itself is found to be unlawful, then *both* the seller of the tying product (who is a party to the tying agreement) *and* the seller of the tied product (who is not a party to the tying agreement itself) may be held liable *as members of a conspiracy to restrain trade by means of the tying agreement.* *Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1043 (5th Cir. 1977) (emphasis in original), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1978). *See also Van Dyke Ford, Inc. v. Ford Motor Co.*, 399 F.Supp. 277, 283 (E.D. Wis.1975). Here, the seller of the tied product, Centennial, while not a party to the tying agreement between Warner and Data General, is alleged to have agreed to impose a tie on the plaintiff. If the tie is unlawful, Centennial is liable.

Defendants' motions to dismiss are granted with respect to count I of the complaint, and denied with respect to counts II and III of the complaint. Discovery, etc. in accordance with the schedule entered this date.